IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| TOMMY JOE WILLIAMS, ) | |
| *Conservator of Michael Sprick,* ) | |
| *An incapacitated individual,* ) | |
| ) | Civil Action No.: 7:13-CV-464 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | By: Hon. Robert S. Ballou |
| OLD HB, INC., *et al.,* ) | United States Magistrate Judge |
| ) | |
| Defendants. ) | |
| ) | |

**REPORT AND RECOMMENDATION**

The attorneys for Michael Sprick ("Sprick"), an incapacitated adult, ask this court to approve a one third contingency fee and associated costs of litigation arising from a $21 million personal injury settlement.[1] Sprick suffered catastrophic injuries in an accident on October 8, 2011 which rendered him incompetent and unable to care for his own personal and financial affairs. The court is charged with protecting the interests of vulnerable parties such as Sprick, and reviewing the proposed settlement of his personal injury claims for fairness and reasonableness. Thus, the court must assure that a $7 million attorney's fee and associated costs are reasonable in this case. The Fourth Circuit instructs that when reviewing a proposed attorney's fee associated with a personal injury settlement, the court must recognize and respect the value that contingency fee arrangements provide, especially to those who otherwise have no access to legal representation. In re Abrams & Abrams, P.A., 605 F.3d 238, 245–46 (4th Cir.

---

[1] The district judge has approved the overall settlement amount, and asked me to provide a report and recommendation on approval of the contingent attorneys' fee and costs, pursuant to 28 U.S.C. § 636(b)(1)(B). Dkt. Nos. 62 & 66.

1

2010). I have examined in detail and with care the materials submitted enumerating the history of the accident, the injuries Sprick suffered, and the work the attorneys undertook to achieve this settlement. I have also considered each of the factors set forth in Johnson v. Georgia Highway Express Inc., 488 F.2d 714, 717–19 (5th Cir. 1974), and specifically the degree of success obtained, "the most critical factor in determining the reasonableness of a fee award." Doe v. Chao, 435 F.3d 492, 506 (4th Cir. 2006). The attorneys for Michael Sprick achieved an excellent result for their client, which will pay for his extensive medical care for the remainder of his life. Having fully considered the Johnson factors, the catastrophic injury underlying this case, the work performed by Sprick's attorneys, and the successful result achieved, I find that the one third contingency fee sought by plaintiff's counsel, and endorsed by his sister and conservator Alexandra Heidebruch ("Heidebruch"), should be approved.

**I.**

On October 8, 2011, 40-year-old German citizen Michael Sprick was struck by a truck while riding his bicycle on the shoulder of Route 100, a two-lane road in Pulaski County, Virginia. Sprick was an avid cyclist, and had traveled to the United States from Germany in September 2011 for a cycling trip that would take him from Chicago to Miami over a number of months. Sprick was cycling through Virginia a month into his trip when this accident occurred. According to witnesses, at the time of the accident, a Freightliner truck traveling behind Sprick drifted over the right white line and onto the shoulder, striking Sprick, who suffered grave injuries as a result of the accident. At the accident scene, Sprick went into cardiac arrest and incurred anoxic brain damage. Sprick was airlifted to Carilion Roanoke Memorial Hospital ("Carilion"), where the medical staff initially recommended that his family discontinue lifesaving care. However, Sprick remained on a ventilator at Carilion the next three months,

receiving treatment for his severe injuries, including the traumatic brain injury. At the request of his family, Sprick was flown back to Germany on a medically equipped jet in December 2011. Since that date, he has undergone multiple surgeries, and has been confined to a hospital or skilled nursing facility where he requires 24-hour care to assist him with all activities of daily living. Sprick does not use a ventilator, but is unable to speak, feed or care for himself, and is confined to a wheelchair or bed.

Sprick is single with no children. Shortly after the accident, his sister, Alexandra Heidebruch, flew to Roanoke from Germany, and sought a bilingual attorney to assist her while she handled Sprick's pending medical and legal issues. Heidebruch's request reached German-speaking Virginia lawyer Michael Kernbach by email on October 13, 2011, and he traveled to Roanoke to meet with Heidebruch a few days later. During their initial meeting, Kernbach explained the legal and insurance process in the United States to Heidebruch in German. Kernbach also reviewed his retainer agreement with Heidebruch, and the terms under which he would represent Sprick relating to his personal injury claim and issues relating to his medical care in the United States. The retainer agreement provided for a one third contingency fee to be paid from any monies collected in Sprick's personal injury claim. Heidebruch expressed her wish that Sprick be returned to Germany as soon as possible, so that her father could see him one last time. Heidebruch agreed to hire Kernbach after their initial meeting because, "he told me to call him anytime; email him as often as I needed; and he offered to do what he could to get Sprick home and would come to Germany whenever it was needed. This was all discussed with me in German so I understood what work he would be doing." Dkt. No. 60-1.

Kernbach immediately began to represent Sprick's interests and pursue his legal claims, performing tasks such as obtaining Sprick's personal effects from the accident scene, hiring an

3

accident investigator, sending letters to the Virginia State Police to preserve and obtain radio traffic transmissions and dispatch logs from the accident, contacting the investigating trooper and eye witnesses, recording the traffic court hearing for the driver in the accident, obtaining interim medical progress reports while Sprick was at Carilion and having them translated into German and sent to Heidebruch, hiring a life care plan expert, retaining an attorney in Germany for the appointment of Heidebruch as conservator for Sprick, and preparing a complaint to be filed in Pulaski Circuit Court.

Kernbach helped return Sprick to Germany by working with Sprick's physicians, who initially refused to allow Sprick to travel due to potential complications in flight. Kernbach negotiated with the insurance carrier for the truck and driver involved in the accident and convinced it to pay the $68,000 needed to cover Sprick's flight to Germany, even though they had not yet accepted liability for the accident. Kernbach communicated with physicians in both Virginia and Germany to coordinate the transition of Sprick's medical care to Germany, drafted German medical releases, and was present in Roanoke to assist with Sprick's trip on December 7, 2011. Believing that these were likely Sprick's final days, Kernbach hired a videographer to videotape a day in Sprick's life while he was at Carilion, and videotape the flight to Germany.

After Sprick arrived in Germany, Kernbach continued to pursue Sprick's claims both in Germany and the United States by developing relationships with Sprick's treating physicians, navigating the German health care system to obtain medical records and bills for treatment, monitoring Sprick's unstable medical condition,[2] and remaining in constant communication with Heidebruch.

---

[2] After his arrival in Germany, Sprick contracted MRSA, and underwent several medical procedures, including placement of a shunt to remove excess fluid from his brain and implantation of an intrathecal Baclofen pump to reduce spasticity in his limbs. Dkt. No. 60-23, p. 6.

On October 24, 2011, a little over two weeks after the accident, Kernbach filed suit in the Pulaski County Circuit Court on Sprick's behalf against Norman Richard Marchant (truck driver), International Brands Corporation, Merita d/b/a Merita Bread Box, and Hostess Brands. See Michael Sprick v. Norman Richard Marchant, et als., Case No. CL1100000593. That action remains pending in state court with no service having been attempted against any defendant. In January 2012, Hostess filed for Chapter 11 bankruptcy in the Southern District of New York, which automatically stayed Sprick's state court action. Kernbach, with Heidebruch's consent, recruited Roanoke attorney Paul R. Thomson to join as counsel in the case, and hired New York law firm Klestadt & Winters, LLP, to assist with filing motions in the bankruptcy court in an effort to lift the bankruptcy stay to allow the personal injury case to go forward outside of the bankruptcy proceedings.

Kernbach and Thomson began what became a year and a half long process of lifting the bankruptcy stay, which prevented Sprick's case from moving forward.[3] Their first two motions to lift the stay were denied by the bankruptcy judge because Hostess's insurance policy included a $1.5 million deductible that was secured with collateral. In the meantime, the bankruptcy court consolidated Sprick's case, along with over four hundred other lawsuits against Hostess pending across the United States, in an Alternate Dispute Resolution ("ADR") process. The ADR process required plaintiffs to participate in binding arbitration and obtain a judgment, which would then be treated as a general unsecured claim against Hostess.

In November 2012, the bankruptcy court liquidated Hostess's assets, which threatened to eliminate the available funds both to administer the ADR process and to secure the collateral for Hostess's insurance deductibles. Kernbach and Thomson prepared and sent a demand package

---

[3] Kernbach and Thomson took the lead on reviewing correspondence and drafting pleadings in the bankruptcy case, to limit additional costs charged by Klestadt & Winters, LLP.

to four insurers for Hostess with a written summary of Sprick's case, along with extensive attachments including photographs, videos of Sprick, a life care plan, wage information, a transcript of the traffic court hearing for the driver in the accident, and German and U.S. records and bills of Sprick's medical care and treatment. In September 2013, Kernbach and Thomson filed a third motion to lift the stay, which was eventually stipulated and agreed to by counsel for Hostess and granted by the bankruptcy court.

Kernbach and Thomson re-filed the personal injury action in this court on October 7, 2013. The case was set for trial on September 8–12, 2014, and a pre-trial order was put in place to assure that discovery progressed in an orderly fashion and that the parties were ready to proceed on the trial date. During the pendency of the case in this court, Kernbach and Thomson engaged in discovery and filed multiple motions for summary judgment. Dkt. Nos. 23, 26 & 29. On July 15, 2014, the parties reached an agreement to resolve this case for $21 million.

## II.

The court has a duty to protect the interests of those who may be especially vulnerable to manipulation or who may be unable to protect themselves, such as minors and incapacitated adults. Abrams, 605 F.3d at 243. In fulfilling that duty, the court has the inherent power and an obligation to ascertain whether an attorney's fee agreement involving an incompetent, including a contingent fee contract, is reasonable. Bergstrom v. Dalkon Shield Trust (In re A.H. Robins Co.), 86 F.3d 364, 373 (4th Cir. 1996); Allen v. United States, 606 F.2d 432, 435 (4th Cir. 1979). The court must make an independent investigation into the fairness and reasonableness of a fee to be charged against an incompetent person's estate, and that inquiry is guided by the twelve factors first set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974), and adopted by the Fourth Circuit in Barber v. Kimbrell's, 577 F.2d 216, 226 (4th

Cir. 1978) and Allen, 606 F.2d at 435–46 ("the Johnson factors"). Abrams, 605 F.3d at 243–44. The Fourth Circuit has construed the Johnson factors as:

> (1) the time and labor required in the case, (2) the novelty and difficulty of the questions presented, (3) the skill required to perform the necessary legal services, (4) the preclusion of other employment by the lawyer due to acceptance of the case, (5) the customary fee for similar work, (6) the contingency of a fee, (7) the time pressures imposed in the case, (8) the award involved and the results obtained, (9) the experience, reputation, and ability of the lawyer, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship between the lawyer and the client, and (12) the fee awards made in similar cases.

Abrams, 605 F.3d at 244. Not all factors may apply to a given case; the court must consider and provide detailed findings with regard to each of the twelve factors. Id. at 436. I review each of the twelve Johnson factors in detail below.

### A. The Award Involved and the Results Obtained

The Fourth Circuit has instructed that "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." Doe, 435 F.3d at 506; see also Abrams, 605 F.3d at 247 (finding it erroneous for the district court to "fail to recognize that an $18 million settlement served the client well by any standard and particularly in light of National Union's $21 million policy limit."). Here, Sprick's counsel achieved a great deal of success by securing a significant settlement for his claim. The settlement will pay all outstanding medical bills and liens in both the United States and Germany, and all legal costs and expenses. A fund in excess of $13 million will remain to provide for Sprick's future medical care. Heidebruch has been appointed to serve as Sprick's permanent conservator, and with the guidance and counsel of an attorney in Germany, the net settlement proceeds will be structured to last through Sprick's expected lifetime. These funds will be appropriately administered in accordance with German law through the oversight of the German courts.

All parties involved agree that this settlement is a successful resolution of Sprick's claims. As counsel noted, this is one of the largest personal injury settlements ever recovered in Virginia. Heidebruch was satisfied with the amount of settlement, and actively supports the attorneys' fee award sought by counsel. Likewise, counsel for Hostess filed an affidavit supporting the attorneys' fees sought and representing that plaintiff's counsel ultimately received a full settlement value for Sprick's case. Dkt. No. 57, p. 4. I am satisfied that plaintiff's counsel secured the best result possible for Sprick's claims.

### B. Contingency Fee Awards

The significant settlement amount resulted in a correspondingly large one-third contingency fee of $7 million. Such a hefty fee may provoke a concern on the surface of fairness and reasonableness based purely on its size. However, I remain mindful of Judge Wilkinson's admonition in Abrams of the significant role and benefits a contingency fee plays in our legal system. Indeed, contingency fee arrangements often provide the only practical means by which a plaintiff can economically obtain the services of a competent lawyer to prosecute his claim. The contingency fee is sometimes called the "poor man's key to the courthouse door," and it enables a litigant with a meritorious cause of action to obtain competent counsel. Abrams, 605 F.3d at 245. "[A]ccepting reasonable contingency agreements ... increases the likelihood that a claimant can find an attorney sufficiently committed and skilled to litigate successfully." Wells v. Sullivan, 907 F.2d 367, 372 (2d Cir. 1990).

Certainly, in this case the contingency fee agreement was the "key to the courthouse door" that allowed Heidebruch to retain attorneys to immediately assist with Sprick's legal claims and eventually yield an outstanding recovery for his long-term medical needs. Without such an arrangement, Heidebruch likely would not have been able to actively and promptly

pursue Sprick's legal claims against both the tortfeasors and their insurance carriers, including securing the early payment from the liability insurance carrier to allow Sprick's medical airlift to Germany, so he could be with his family shortly after the accident. Dkt. No. 60-1, p. 2. Faced with Sprick's dire medical condition, his mounting medical bills, an uncertain future, and the need to bring her brother home, Heidebruch, who came from her home in Germany to assist with Sprick's medical needs, was not in a position to hire an attorney, pay a retainer, and finance the investigation and preparation of Sprick's case. The contingency fee agreement allowed Heidebruch to dedicate Sprick's financial resources to his ongoing medical needs during the pendency of the litigation, while his attorneys advocated his claims over a period of four years with no request for payment of costs or fees. Notably, Heidebruch filed an affidavit with the court stating her belief that the attorneys' fees and costs incurred were a reasonable amount and properly incurred, and thus, she asks that the full contingency fee be awarded in full. Dkt. No. 60-1, p. 4.

     I am also cognizant of the need to avoid any comparison of the contingency fee to the amount of a reasonable recovery using an hourly billing rate. See Abrams, 605 F.3d at 245–46. Unlike hourly billing rates, contingency fee agreements transfer a significant portion of the risk of loss in the case to the attorneys, which many attorneys are unwilling to accept without a guaranteed contingency percentage of the recovery. "[I]t may be necessary to provide a greater return than an hourly fee offers to induce lawyers to take on representation for which they might never be paid, and it makes sense to arrange these fees as a percentage of any recovery." Abrams, 605 F.3d at 246; see also In re Sunbeam Sec. Litig., 176 F. Supp. 2d 1323, 1335 (S.D. Fla. 2001) (quoting Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 548 (S.D. Fla. 1988) ("A contingency fee arrangement often justifies an increase in the award of attorney's fees."). Thus,

contingent fees must compensate not only for the attorneys' time and effort, but also for the risk of a small fee or no recovery and the uncertainty of when any fee award may be received. In short, a contingency fee "automatically handles compensation for the uncertainty of litigation" because it "rewards exceptional success, and penalizes failure." Kirchoff v. Flynn, 786 F.2d 320, 326 (7th Cir. 1986).

### C. Customary Fee for Such Work

Here, the retainer agreement provides for a one-third contingency fee and reimbursement of expenses incurred. Dkt. No. 60-1, p. 11. Kernbach notes that he would ordinarily charge a 40 percent contingency fee for this type of case; however, Kernbach stated in his affidavit that "as I understood the injuries to be catastrophic at that time, I decided to only charge a contingency fee of one-third in this case." Dkt. No. 60-24, p. 2. Heidebruch represented that she "understood that [Kernbach] would be paid his fee based on the outcome of the case by way of a contingency fixed at one-third of the settlement. I also understood that he would be paying for the expenses of the case and keeping a ledger of those costs, and that he would be reimbursed for those costs from the settlement as well." Dkt. No. 60-1, p. 2. When Thomson was added as counsel in the case, Heidebruch understood that he would be paid out of the original contingency agreement and would also be reimbursed for his expenses from any settlement amount.[4] Dkt. No. 60-1, p. 2.

In this court's experience and as reflected in the numerous affidavits of attorneys supporting this fee request, a one-third contingency rate is reasonable for this type of case. See Dkt. Nos. 60-30–60-38. Accordingly, I find that at the time this retainer agreement was signed, it was fair and reasonable for Kernbach and Heidebruch to agree to a one-third contingency fee.

---

[4] Thomson agreed to a fee split of 25 percent of the one-third attorneys' fee, plus reimbursement for costs. Dkt. No. 59.

10

The remainder of this opinion examines whether such a fee agreement remains reasonable, given the additional Johnson factors.

### D. Time and Labor Expended

Sprick's attorneys devoted significant time and resources to obtain this settlement result, and have submitted voluminous affidavits and supporting documents summarizing the professional time they have devoted to this case. The majority of the time set forth in these summaries is corroborated by copies of time log entries and billing reports, which document the extensive time and labor required to prosecute this case.

Kernbach and Thomson both estimate that they each spent around 1,900 hours on this case, for a conservative total of 3,800 hours. Dkt. Nos. 59 & 60-24. Kernbach further represented that during the course of this litigation he exchanged or reviewed over 7,600 emails, received and reviewed over 3,000 documents filed in Hostess's bankruptcy case, and traveled to Germany five times. Dkt. Nos. 60-24 & 63-1. These claims are bolstered by Heidebruch's testimony that she exchanged "hundreds of emails, text messages and Facebook messages" with plaintiff's counsel. Dkt. No. 60-1, p. 5. She further states that "Mr. Kernbach called me and emailed me at many times when it was late at night in the United States; weekends and holiday times, especially when I was concerned for Michael [Sprick] when he suffered medical complications and serious medical setbacks. I have no reason to doubt that both lawyers devoted extensive time and effort in this case and had set aside time for me when they were on vacations or holiday times." Dkt. No. 60-1, p. 5.

The various tasks performed by plaintiff's counsel in their representation of Sprick in two different courts over the past four years is set forth in detail in the documents supporting their attorneys' fee request, and will not be restated here. Notably, counsel's representation included assisting the family in arranging Sprick's medically assisted flight to Germany; having almost

11

every document involved in the case translated from English to German or vice versa; navigating the German public health care system both for purposes of pursuing high-level healthcare for Sprick and obtaining records of Sprick's medical care and costs; developing relationships with Sprick's health care providers in Germany and preparing them to give deposition testimony; tackling the effect of settlement on subrogation or lien issues in Germany; addressing the bankruptcy litigation that stayed Sprick's personal injury case and threatened to force his claim into an ADR process; hiring numerous experts, including an economist, accident reconstructionist and life care planner; and arranging for defense counsel to visit Sprick at his long-term care facility in Germany.

 Kernbach and Thomson both made numerous trips to Germany to meet with Sprick's medical providers and family, obtain medical records, and determine his future medical costs. Sprick's expert life care planner traveled to Germany on multiple occasions to meet Sprick's physicians and family and assist with developing his life care plan. Additionally, Kernbach and Thomson were in constant communication with Heidebruch throughout the litigation regarding Sprick's unstable medical condition.

 The successful mediation of this case occurred just two months before the scheduled trial date; thus counsel was also required to complete most of the preparation needed to present Sprick's case at trial. They arranged for Sprick's treating physicians and therapists to testify either live at trial or by video deposition; scheduled the depositions of Heidebruch, Sprick's father, and their life care expert; and conducted a mock trial using a focus group to finalize their strategy and determine a likely trial verdict. It is apparent from the documentation before the court that this case was exceedingly time and labor intensive.

### E. The Novelty and Difficulty of the Questions Presented and the Skill Required to Perform the Necessary Legal Services

This case involved novel and difficult issues presented by the severity of Sprick's brain injury, cross-continent medical evaluation and treatment, and recent medical advancements with regard to various states of mental awareness with brain injury. Due to the severity of Sprick's brain injury, counsel faced the difficult task of understanding the nature of his brain injury to determine his level of consciousness. Whether Sprick experienced some degree of consciousness or environmental awareness, as opposed to being in a persistent vegetative state, had a significant impact on his ability to experience pain and suffering, the nature of the medical treatment he received, and his life expectancy. Measuring consciousness and awareness is an evolving area of brain injury medicine, much more complicated than simply observing the patient for signs of wakefulness. Counsel was required to educate themselves and work closely with Sprick's health care providers to understand recent medical strides in this area, retain experts, and create video footage for consideration by the insurance carriers and jury. All of these uncertainties no doubt impacted the value of the case.

Further, this case presented the unique challenge of having the client and his medical providers located in Germany, and all of the medical records written in German. Thus, counsel was required to develop relationships with Sprick's German treating physicians to gain their trust and cooperation, prepare fact and physician witnesses for depositions in both the United States and Germany, and address medical lien and reimbursement issues in both countries. Counsel's representation required the ability to speak German fluently, navigate a foreign country's medical and legal systems, and prepare a significant traumatic brain injury case involving liability and trucking issues for trial. Overall, the case required a high degree of unique skills, not only to prepare and present a complicated personal injury case involving a traumatic brain injury,

but further to avoid questions of liability, navigate the bankruptcy proceedings, and determine the future medical costs for Sprick's life care plan.

### F. The Experience, Reputation and Ability of the Lawyers

Kernbach and Thomson submitted their curricula vitae to the court, along with numerous affidavits of local attorneys, lauding their experience, reputations and abilities. Counsel for defendants represented that the litigation reflected a very civil and cooperative administration of the case, which lowered the overall expenses and ultimately led to the eventual settlement of the case. Dkt. No. 57, p. 4. Kernbach and Thomson are known to this court, they have considerable experience litigating complex personal injury cases, and I am satisfied that they possess the expertise in their fields necessary for this matter and likewise have the professionalism, skill set, and necessary foresight to manage this difficult case – as the results of the successful mediation demonstrate.

### G. The Time Pressures Imposed in the Case and the Preclusion of Other Employment

The uncontradicted affidavits of Kernbach and Thomson represent that their concentration of efforts on this case drastically reduced the number of other matters they could accept during that time. Dkt. Nos. 59 & 60-24. Kernbach and Thomson are both solo practitioners, and the necessity of multiple trips to Germany alone reflects that they were required to devote significant time to this case and to reschedule or turn away other matters. A case of this magnitude would certainly be very time consuming, and I accept counsel's representation that their continuing responsibility for the prosecution of this matter precluded them from accepting other legal work while this case proceeded.

### H. The "Undesirability" of the Case

At first blush, Sprick's case may seem quite desirable to experienced personal injury attorneys. This is frequently the view when looking backward knowing the outcome of the litigation and the settlement achieved. However, at the outset, this case may not have seemed so attractive in October 2011. "'Undesirability' and relevant risks of a case must be evaluated from the standpoint of plaintiff's counsel as of the time they commenced the suit, not retroactively, with the benefit of hindsight." In re Checking Account Overdraft Litig., 830 F. Supp. 2d 1330, 1364 (S.D. Fla. 2011). "The point at which plaintiffs settle with defendants…is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them." Skelton v. General Motors Corp., 860 F.2d 250, 258 (7th Cir. 1988); see also Alderman v. Pan Am World Airways, 169 F.3d 99, 103 (2d Cir. 1999) ("The reasonableness of a contract including an attorney fee agreement, is to be evaluated at the time it was made.")

Sprick's claim presented substantial challenges and required attorneys with specific skill sets. Kernbach and Thomson faced significant risks when they undertook their representation, which, in hindsight, would be handsomely rewarded. Here, when plaintiff's counsel undertook their representation entirely on a contingent fee basis, they assumed a significant risk of non-payment or underpayment due to liability issues, insurance coverage questions, and Sprick's precarious health condition.

Defendant denied liability in this case until April 21, 2014. The truck driver was charged with reckless driving as a result of the accident, but maintained that another vehicle passed him on the left and started to enter his lane, and at the same time Sprick began to enter his lane from the right. The truck driver further alleged that he left the scene to follow the other car and obtain a license plate number, but was unable to do so and returned to the accident scene. There were

15

several eyewitnesses to the accident, but none were able to conclusively confirm or deny the driver's claim that a car passed him on the left at the time of the accident. Further, Sprick was found at the scene of the accident without a helmet, which raised possible defenses to recovery.

Sprick's unstable medical condition created risks as well, as the determination of the nature of his injuries impacted his life expectancy and the value of future costs necessary for his care. At the time Kernbach undertook this representation, there were no assurances that this case would yield a substantial verdict. Rather, the full scope of the claim became apparent only after extensive investigation and work by counsel. Even assuming that plaintiff's counsel was successful in proving liability and Sprick survived the litigation, the case also faced the risk of insufficient or unavailable funds to cover a damages award. Plaintiff's counsel knew that the truck driver was likely to be judgment-proof, and they faced the possibility of either no recovery, or a greatly reduced recovery, without access to insurance coverage. Hostess's bankruptcy declaration also created a great deal of uncertainty as to the availability of insurance funds to cover a settlement or ADR award.

This case also required an investment of substantial resources by plaintiff's counsel with no compensation for an undetermined period of time. Kernbach and Thomson collectively expended over $165,000 in out-of-pocket expenses during the pendency of this litigation, covering such costs as the forensic evaluation of Sprick's computer and cell phone found at the accident, accident reconstruction, travel to Germany, translation of documents to German and English, expert fees and costs, medical illustrations, copying costs, and international cell phone charges. Dkt. Nos. 60-40, 60-41, 63-1, & 69-1. The nature of this case, involving the cross-continental litigation of a severe traumatic brain injury, demanded the advancement of significant costs by counsel, without assurance of reimbursement.

### I. The Nature and Length of the Professional Relationship

Kernbach's representation of Sprick began just days after his accident, and will continue after this court approves the fee award in this case. Indeed, while the approval of attorneys' fees was pending in our court, Kernbach and Thomson continued to work on resolving the German legal and tax issues for Sprick.  Kernbach traveled to Germany for a fifth time in December to meet with the legal and claims department of Sprick's health insurance, and to explain to the German court the basis of the distribution of the net the proceeds to Sprick.  With regard to the nature of the representation, the court need look no further than Heidebruch's representation that, "I believe the attorneys' fees and costs incurred by both attorneys are reasonable and properly incurred by them which reflect the significant amount of effort, legal work and travel needed to properly obtain the funds necessary to take care of my brother." Dkt. No. 60-1, p. 4.

### J. Fee Awards in Similar Cases

It is difficult to find many similar cases for comparison of the fee award in this district, given the size of this settlement. However, a one third contingency fee is a standard fee agreement for this type of personal injury case.  Further, after the Abrams case was remanded to the district court for the Eastern District of North Carolina, the court ultimately awarded the one third contingency fee sought in that case. Pellegrin v. Nat'l Union Fire Ins. Co., Case No. 5:08-cv-349 (E.D.N.C. July 19, 2010) (Dkt No. 53).  A review of fee awards across the country reflect that courts routinely approve or award fees up to and in excess of 30 percent in multi-million dollar settlements.  See generally Waters v. Int'l Precious Metals Corp., 190 F.3d 1291 (11th Cir. 1999) (affirming fee award of 33 1/3 percent of settlement of $40 million); Gaskill v. Gordon, 160 F.3d 361 (7th Cir. 1998) (affirming fee award of 38 percent of settlement of $20 million); In

re Linerboard Antitrust Litig., Civ. Action No. 99-1000, 2004 WL 1221350 (E.D. Pa. June 2, 2004) (awarding fees of 30 percent of $202 million).

### K. Costs

Plaintiff's counsel set forth out-of-pocket expenses in the amount of $165,952.91 for the entire course of this litigation.[5] Dkt. No. 76. These expenses include many items that are routinely billed to clients, such as copying charges, telephone charges, travel, and expert fees, in addition to regular hourly rates or contingency fees. Dkt. Nos. 60-40, 60-41, 63-1, 69-1. No party has contested or objected to any of the items set forth as costs. After a review of these items, I find them to be reasonably incurred, particularly for litigation of this scope and magnitude, and recommend that the requested costs be approved.

### III.

The task before me is to determine whether a contractual agreement for attorneys' fees, which all parties support, is reasonable and fair and should be approved. It is not my role to place a value on counsel's representation in this case, or retroactively impose a different bargain than that agreed to by Heidebruch and counsel. Rather, I am charged with reviewing the agreement for reasonableness, using the twelve Johnson factors, to ensure that Sprick's interests are sufficiently protected. I have reviewed the hundreds of documents submitted in support of this request, and considered each of the Johnson factors in detail. I have also remained mindful of the positive societal benefits created by contingent fees and the need to properly incentivize such agreements. Considering the significant amount of the settlement award, the benefits that counsel's representation has provided and will continue to provide to Sprick, the risks present when counsel initially undertook representation of this case, and the remaining Johnson factors, I

---

[5] Calculated as follows: Michael Kernbach's Costs: $68,372.01 + Paul R. Thomson's Costs: 97,580.90 = $165,952.91. See Dkt. No. 76.

find that the fees sought in this case are reasonable and fair and recommend that they be approved.

  The clerk is directed to transmit the record in this case to the Honorable Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection.

            Enter: December 31, 2014

            *Robert S. Ballou*

            Robert S. Ballou
            United States Magistrate Judge